**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**
--------------------------------------------------------X
JERMAINE LEE,

                 Plaintiff,

            -against-

WINTHROP UNIVERSITY HOSPITAL,
doing business as Winthrop University Hospital
Service Corporation, Winthrop University
Hospital Association, Winthrop-South Nassau
IPA, LLC, Winthrop-South Nassau
Management Services Organization, Inc.,
TERRY VITALIE, STEVE WORTH,
ROSEANN CALDON, and GARRY
SCHWALL, individually and in their official
capacity and as aiders and abettors,
                 Defendants.
--------------------------------------------------------X

**ORDER**

13-CV-5003 (ADS)(GRB)

**FILED**
**CLERK**

11/13/2015 11:35 am

**U.S. DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**
**LONG ISLAND OFFICE**

<u>**APPEARANCES:**</u>

**The Law Office of Matthew S. Porges, Esq.**
*Attorney for the Plaintiff*
641 President St., Suite 205
New York, NY 10009
       By: Bryant Cherry-Woode, Esq., Of Counsel

**Richard C Arce, Esq.**
*Attorney for the Plaintiff*
453 FDR Drive, Apt. 807C
New York, NY 10002

**Kelley Drye & Warren, LLP**
*Attorneys for the Defendants*
101 Park Avenue
New York, NY 10178
       By: Barbara E. Hoey, Esq.
           David I. Zalman, Esq.
           James Bryan Saylor, Esq.
           John Mattiace, Esq., Of Counsel

**SPATT, District Judge**.

This case arises from allegations that the Plaintiff Jermaine Lee (the "Plaintiff"), an African American male, was terminated from his job as a part-time Physical Therapy Aide in the Physical Therapy Department of Winthrop-University Hospital based on his race.

On September 6, 2013, the Plaintiff commenced this action against the Defendants Winthrop-University Hospital ("Winthrop"), incorrectly named in the caption as "Winthrop University Hospital d/b/a/ Winthrop University Hospital Service Corporation, Winthrop-South Nassau IPA, LLC, and Winthrop-South Nassau Management Services Organization, Inc."; (ii) Teresa Vitale, incorrectly named in the caption as "Terry Vitalie" ("Vitale"); (iii) Stephen Wirth, incorrectly named in the caption as "Steve Worth" ("Wirth"); (iv) Roseann Caldon ("Caldon"); and (v) Garry Schwall ("Schwall").

The Plaintiff asserts (i) a race discrimination claim against Winthrop under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.* ("Title VII"), and the New York Human Rights Law, N.Y. Exec. Law § 296 ("NYSHRL"); and (ii) a race discrimination claim against Caldon, Schwall, Wirth, and Vitale (collectively, the "Individual Defendants") under the NYSHRL and the New York City Human Rights Law, N.Y.C. Admin. Code § 8–107(1)(a)(7) ("NYCHRL").

Presently before the Court is the Defendants' motion for summary judgment pursuant to Federal Rule of Civil Procedure ("Fed. R. Civ. P.") 56 to dismiss the Plaintiff's complaint in its entirety.

For the foregoing reasons, the Defendants' motion is granted.

# I. BACKGROUND

Unless otherwise specified, the following facts are drawn from the parties' Rule 56.1 statements.

## A. The Parties

The Plaintiff is a Nassau County resident who worked in Winthrop's Physical Therapy Department ("PT Department") from December 15, 2008 to June 20, 2012.

The Defendant Winthrop is a not-for-profit university-affiliated medical center located in Nassau County, New York. The PT Department "provides evidence-based physical therapy services to ensure state-of-the-art treatment and positive outcomes for patients." As of June 2012, the PT Department employed seven physical therapists and five physical therapy aides ("PT Aides") who worked on a full-time, part-time, or *per diem* basis. The PT Department currently employs two employees who identify as African American.

The Defendant Wirth was the Director of Outpatient Rehabilitation Services and Sports Medicine Services at Winthrop during the period of the Plaintiff's employment at Winthrop.

The Defendant Vitale was a Senior Physical Therapist in the PT Department during the relevant period. She reported to Wirth.

The Defendant Caldon was Winthrop's Manager of Employment Relations during the relevant period.

The Defendant Schwall was appointed as Winthrop's Chief Operating Officer on March 10, 2010.

**B. The Plaintiff's Hiring and Relevant Employment Policies**

In November 2008, the Plaintiff applied for an open PT Aide position in the PT Department. The Plaintiff testified that in late 2008, he met with Vitale and Wirth about the open position. (Zalman Decl., Ex. A, at Tr. 89:4–17.)

Shortly after the meeting, Winthrop hired the Plaintiff as a *per diem* PT Aide. (Wirth Decl. at ¶ 11.) It is not clear from the record what the precise duties of a *per diem* PT Aide were and how those duties differed from the duties of a part-time or full-time PT Aide.

However, it is clear and undisputed that the Plaintiff was subordinate to and supervised by Vitale and other physical therapists and PT Aides who were employed on a full-time and part-time basis. (The Joint 56.1 Statement at ¶ 12; <u>see also</u> Wirth Decl. at ¶ 11.) Moreover, unlike, part-time and full-time aides, *per diem* employees were not entitled to health care benefits. (<u>Id.</u> at ¶ 12.)

On November 18, 2008, the Plaintiff signed an acknowledgement form stating, "I received a copy of the Winthrop-University Employee Handbook and understand that it is my responsibility to know and abide by its contents." (Zalman Decl., Ex. D.)

The Winthrop Handbook contains a section entitled, "Other Work Rules," which warns that "[i]nappropriate behavior, as described within these rules, may result in disciplinary action up to and including discharge." (Zalman Decl., Ex. C, at 7.) Examples of "inappropriate behavior," include, "[d]iscourteous treatment . . . of patients, visitors, students, other employees or associates"; "[i]nterfering with another employee's work"; and "insubordination," which is defined as, "refusal of an employee to follow instructions or to perform designated work where such instructions or work normally and properly are required of an employee." (<u>Id.</u> at 7–8.)

The Handbook further notes that "[i]f an employee's behavior or performance is found to be unacceptable or if corrective action has failed to produce positive results, the employee may be dismissed." (Id. at 9.)

Finally, the Handbooks prohibits discrimination in all of its employment practices. (Zalman Decl., Ex. D, at 4.)

On November 18, 2008, the same day, the Plaintiff also signed an acknowledgement stating that he received a copy of Winthrop's Code of Conduct (Zalman Decl., Ex. D.) The Code of Conduct also warned that "inappropriate behavior, as described within these regulations, may result in disciplinary action up to and including immediate discharge." (Zalman Decl., Ex. E.) The Code of Conduct included examples of inappropriate behavior which were similar to the Handbook, including "insubordination," "discourteous treatment . . . of patients, visitors or other employees," and "disrespectful conduct towards supervisors / managers." (Id.)

**C. The Plaintiff's 2008 and 2009 Employment History**

On December 15, 2008, the Plaintiff began work at Winthrop's Franklin Avenue location.

The Plaintiff testified that when he initially started working at Winthrop, his relationship with Vitale was "friendly." (Zalman Decl., Ex. A, at Tr. 94:2–5.) For example, in 2009, Vitale invited the Plaintiff to her home for a "summer party and a Christmas party." (Id. at Tr. 95:7–13.)

In addition, on October 9, 2009, Vitale sent a letter to Gary Krasilovsky, PT, PhD, the Director of the Hunter College Physical Therapy Program, recommending that the Plaintiff be admitted to the Hunter College Physical Therapy Program. (Zalman Decl., Ex. B.) In the letter,

Vitale described the Plaintiff as a "respectable, hard-working, sincere, and motivated young man." (Id.)

Despite Vitale's letter of recommendation, the Plaintiff does not appear to have attended Hunter, as he began a degree program at Touro in 2013. (Cherry-Woode Decl., Lee Dep., Ex. A, at Tr. 30:9–15.)

Late in 2009, the Plaintiff asked Wirth how he could begin receiving healthcare benefits. Wirth told him that under Winthrop's policy, only part-time and full-time employees could receive healthcare benefits, and thus, as a *per diem* employee, the Plaintiff was not eligible for benefits. However, he suggested that the Plaintiff apply for a part-time position and offered to advise the Plaintiff when a position became available.

On April 1, 2010, April Delligatti ("Delligatti"), a *per diem* employee in the PT Department, was hired for a full-time position, making her eligible for healthcare coverage. (Caldon Reply Decl. at ¶¶ 8–9.) Delligatti submitted an election form to opt-in to the Defendants' healthcare plan. (Id. at ¶ 10.) As explained in more detail below, the Plaintiff claims that Delligatti's hiring for a full-time position, instead of the Plaintiff, reflects racial discrimination.

In August 2010, a part-time PT Aide position became available, and Wirth and Vitale advised the Plaintiff to apply for it. The Plaintiff applied for the position.

On August 15, 2010, Wirth approved his application, and he was hired as a part-time PT Aide. As a result, the Plaintiff became eligible for healthcare benefits.

It is undisputed that under Winthrop's employment policy, in order to participate in Winthrop's healthcare plan, an employee is required to "submit an initial Election Form to the

Plan Administrator prior to your participation Date and during the period designated by the Plan Administrator as your initial 'enrollment period.'"  (Zalman Decl., Ex. C, at 5.)

However, the parties dispute whether the Plaintiff submitted an election form to opt into Winthrop's healthcare coverage.  The Defendants assert that the Plaintiff never opted into this coverage.  (The Joint 56.1 Statement at ¶ 34.)  In support, they rely on a declaration filed by Wirth, <u>see</u> Wirth Decl. at ¶ 17, and the Plaintiff's testimony as follows:

> Q. Now, in order to actually receive medical benefits, you had to apply for and opt into the medical benefits system, correct?
> A. Yes.
> Q. Do you know when in time you actually opted into the medical benefits system?
> A. No.
> Q. Did you do it immediately upon getting this part-time assignment -- part-time position, excuse me?
> A. I don't recall.

(Zalman Decl., Ex. A, at Tr. 237:14–238:2.)

On the other hand, the Plaintiff, relying on the same testimony, asserts that he may have opted into the health program.  (The Joint 56.1 Statement at ¶ 34.)  He does not offer any other evidence to support this assertion.

**D. The Discriminatory Conduct Alleged by the Plaintiff**

Although the specific dates are not made clear in the record, the Plaintiff testified that shortly after he began working at Winthrop in 2008, Vitale asked him to provide personal training services to Ashely Vitale, her daughter.  According to the Plaintiff, "soon after [he] started . . . personally training her," the Plaintiff developed a romantic relationship with Ashley Vitale.  (Zalman Decl., Ex. A, at Tr. 108:8–21.)

The Plaintiff further stated that he ended the relationship because of the "harassment I was dealing with from her mom." (Id. at Tr. 109:10–15.) When asked to specify how Vitale harassed the Plaintiff, he testified:

> Q. How did Terry harass you?
> A. With the racial slurs and all this stuff that's in the Complaint.
> Q. Well, just to be clear, Mr. Lee, you've made two allegations about statements that Terry made. You said that she called you a black son and that at some point she called you a womanizer,
> correct, sir?
> A. That's correct.
> Q. Did she make any other statement to you about your race?
> A. I don't recall.

(Id. at Tr. 109:20–110:9.)

The Plaintiff could not recall the exact dates when Vitale referred to him as a "black son" and a "womanizer," nor how many times she did, but stated that "[i]t was frequent." (Id. at Tr. 110:18–11–113:3.)

The Defendants deny that Vitale had any knowledge of the Plaintiff's relationship with her daughter until after the Plaintiff's employment was terminated. (The Def.'s Supp. 56.1 Statement at ¶ 1–3.) In support, they rely on the testimony of Ashley Vitale — she stated that she never told Vitale, her mother, of her relationship with the Plaintiff. (Zalman Supp. Decl., Ex. C, at Tr. 28:11–13.)

The Plaintiff also testified that Wirth called him a "faggot," a "schmoozer," and a "black son." (Id. at Tr. 49:3–23.) The Plaintiff could not recall when Wirth made these comments, nor how frequently he did so. (See id. at Tr. 52:4–7.) He claimed that he complained to Caldon about these statements, and "she told [him] to just work it out." (Id. at Tr. 53:13–16.)

The Plaintiff could not recall whether any other employee in the PT Department made racial comments to him. (Id. at Tr. 54:17–22.)

**E. The Plaintiff's Disciplinary History**

On June 1, 2010, Vitale signed an internal human resources form entitled, "Employee Warning," stating that on May 3, 2010 she, Wirth, and an employee identified as "Tony" met with the Plaintiff to give him a verbal warning for allegedly leaving the building on April 30, 2010 to get lunch and failing to "punch out" on the Defendants' time cards. (Zalman Decl., Ex. C.)

When asked about the incident at his deposition, the Plaintiff testified, "Terry [Vitale] instructed me to pick up the staff lunch and I did and I was written up for it." (Zalman Decl., Ex. A, at Tr. 223:21–24.)

The parties also dispute whether the Plaintiff engaged in inappropriate and insubordinate conduct on at least four occasions in November 2010. The Defendants rely primarily on two Employee Warning forms signed by Wirth and an unnamed employee on November 24, 2010, which describe the incidents as follows:

Beginning of November 2010

- Jermaine interrupted Teresa Errigo Vitale, SR PT, while she was busy with her work day stating that he needed a form filled out for PT School at Mercy College. Teresa told Jermaine to put the form on her desk and she would get to it when she could.
- Jermaine told her that she could do it right now and stated that he will stand right behind her until it is done.
- Teresa filled out the form so there wouldn't be another confrontation with him.

November 19, 2010:

- Teresa came back from a meeting at the Garden City Hotel; Jermaine said to her that he needed to speak with her right now. Teresa told him that she had some work to do and then would speak to him.
- About 20 minutes later, Teresa asked Jermaine if he wanted to speak now and he stated no. When she turned around, Teresa heard him say, 'You will get yours.'

Disciplinary Action on 11/23/10:

9

- Teresa spoke to Jermaine letting him know she is unhappy with the way he is treating her and being very confrontational.
- Jermaine denied staying [sic] 'you will get yours'
- Instructed him to review page [sic] 3 and 4 of the policy and procedure manual.

(Zalman Decl., Ex. G.)

A separate form, also signed by Wirth and an unnamed employee on November 24, 2010, describes a fourth incident:

11/23/2010

- Jermaine was speaking to a patient calling him a playboy. He stated that the patient will have 5 women over this weekend and that he will be pimping.
- When the patient was about to leave Jermaine told the patient not to forget his pimping stick, which was his single axis cane.
- Teresa spoke to Jermaine stating not to speak to patients in that manner in this clinic.
- Jermaine did apologize to the mother of a child sitting in a chair next to her son being treated. The mother did report that she didn't hear the conversation that he was having with the patient.

(Id.)

The Plaintiff denies that the first three incidents took place, relying primarily on his own testimony. (Zalman Decl., Ex. A, at Tr. 241:20–242:20.) As to the fourth incident, the Plaintiff recalled calling a patient a "playboy" but did not recall saying, "[you] will have 5 women over this weekend and that [you] will be pimping," nor did he recall referring to the patient's cane as a "pimping stick." (Id. at Tr. 243:18–244:7.)

The parties further dispute whether the Plaintiff received these disciplinary warnings. The forms themselves contain notations indicating that the Plaintiff refused to sign them. (See Zalman Decl., Ex. G.) However, at his deposition, the Plaintiff denied receiving the forms and only remembered being "written up for saying playboy." (Zalman Decl., Ex. A, at Tr. 254:11–18.)

On December 3, 2010, the Plaintiff and an unnamed employee of Winthrop signed a

"Last Chance Agreement."  (Wirth Decl., Ex. G.)  The preamble of the agreement states:

> As you are aware you are on a final warning for insubordination and improper
> personnel conduct.  You have been previously counseled on issues of improper
> personnel conduct and insubordination.  On 11/24/2010 you were asked to have a
> discussion regarding your actions in the director's office.  You decided not to
> have discussions in this setting and then inappropriately engaged patients into the
> conversation while many were receiving treatment . . . . You did not follow
> instructions of your supervisors and were asked to punch out and leave due to
> insubordination, you refused two times.  After another discussion[,] you then
> punched out and left.

 (Id.)

In a section entitled, "Your Agreement," the Plaintiff agreed to "refrain from constant

confrontations with supervisors and wait for the appropriate time and place for discussions,

decided by the supervisor" and to "follow all policy and procedures . . . decided by the Director

of facility each work shift."  (Id.)

In the agreement, the Plaintiff also acknowledged, "I understand that failure to comply

with the above will result in my immediate termination . . . . I also understand that Winthrop

University Hospital may terminate my employment at any time without notice and that potential

reasons for discharge are not limited by this agreement."  (Id.)

The Plaintiff did not deny signing the agreement but testified he did so under duress, "It

was three Caucasians against one black male.  I wanted to keep my job.  I was told to sign it.  I

was not given a copy." (Zalman Decl., Ex. A, at Tr. 300:18–23.)  He also testified that Caldon —

who as noted, was Winthrop's Manager of Employment Relations, and also apparently present

when the Plaintiff signed the agreement — did not give him an opportunity to read the agreement

before she told him to sign it.  (Id. at Tr. 296:7–19.)

There is also a dispute as to whether the Plaintiff engaged in additional inappropriate conduct on January 11 to January 13, 2012.  In a declaration filed in support of the Defendants' present motion, Wirth states, "[I]n January 2012, Ms. Vitale reported to me that Mr. Lee had been swinging his hard plastic nametag in an aggressive manner."  (Wirth Decl. at ¶ 24.)  According to Wirth, Vitale and Michele Petherick ("Petherick"), a Physical Therapist who also supervised the Plaintiff, asked him stop swinging his name tag, and the Plaintiff refused to do.  (Id.)

The Defendants also submit a copy of a note allegedly written by Vitale describing the incident:

> 1/13/12:  On Friday Jermaine hit Terry with the badge and Terry asked him nicely to please stop swinging your badge in the clinic you will be hitting the patients.  Steve Wirth witnessed how Jermaine started yelling at Terry in the clinic in front of patients saying, '[I]f you have a problem with me lets go to Roseann [Caldon].'  Terry responded fine lets go.  Steve took Jermaine in his office for approximated [sic] ah [sic] hour to counsel him on his actions.

(Wirth Decl., Ex. H.)

Relying exclusively on his own testimony, the Plaintiff, denies swinging his name tag inappropriately and being told by Vitale or other employees to stop doing so.  (Cherry-Wood Decl., Lee Dep., Ex. A, at Tr. 322:4–25.)

The Defendants assert that on June 1, 2012, the Plaintiff again behaved inappropriately toward Vitale by refusing to take his lunch break according to a schedule set by Vitale.  According to the Defendants, the Plaintiff subsequently swung a plastic "bolster" at Vitale in retaliation for reprimanding him in front of his co-workers.  In support of these assertions, they rely primarily on letters sent by five staff members of the PT Department to Wirth to complain about the incident.

In that regard, in a June 1, 2012 letter to Wirth, Marimme Porzelt ("Porzelt"), a staff member in the PT Department, described the incident as follows:

- Heard and saw Jermaine speaking to Terry [Vitale] in a very over bearing loud manner. He kept repeatedly telling her she was not his boss and that no one was above him . . . .
- He continued to instigate the conversation after Terry tried to end in [sic] numerous times as he started name drop . . . other people in the hospital, . . . , saying that . . . he knew other people and he didn't care what she said.
- After calming down in speech he then proceeded to pick up a bolster and swing it at the desk where she was sitting which came off to me as a very threatening action.

(Wirth Decl., Ex. K.)

Vitale also submitted a written account of the incident to Wirth, in which she stated that on June 1, 2012, after she instructed the Plaintiff to take lunch according to schedule that she set, he began "swinging the green and blue bolster into the work station counter where [she] was at her computer trying to do her paperwork." (Wirth Decl., Ex. I.)

Also on June 1, 2012, Petherick wrote a letter to Wirth stating that he had witnessed the Plaintiff tell Vitale, "no one could tell him what to do, but if [Vitale] had asked nicely and said please, he probably would have done what she wanted." (Wirth Decl., Ex. L.) Immediately following the incident, Bryan Davidson ("Davidson"), another Physical Therapist, also wrote a letter to Wirth indicating that he "overheard" the Plaintiff argue with Vitale in a "disrespectful" manner after she directed him to follow the office lunch break schedule. (Wirth Decl., Ex. M.)

In a June 3, 2012 letter to Wirth, Aya Perkins ("Perkins"), an African American female who worked as a PT Assistant, described the incident in similar terms:

[The] Plaintiff decided to argue with Mrs. Vitale on break times given . . . . He also stated, he doesn't have to follows the rules instructed by her . . . . I attempted to try and defuse the tension and stop him . . . Mrs. Vitale also tried to tell him this but he continued, leaning over the counter in front of her desk in a treating [sic] manner. And proceeded to tell her if she wrote him up nothing would be

done because of who he knew. He appeared to be agitated with repeated flicking of his ID badge, and banging [sic] bolster against . . . the wall of a counter.

(Wirth Decl., Ex. J.)

All five employees also wrote that they had witnessed the Plaintiff commit other acts of misconduct prior to the June 1, 2012 incident, including: (i) "[c]onstantly hugging and treating patients in a manner that is not appropriate for an office setting," Wirth Decl., Ex. K; (ii) "texting on the phone, watching TV or inappropriate socializing/fraternizing with patient[s] during his shift," Wirth Decl., Ex. J; (iii) "call[ing] patients 'pet' names, like 'momma,'" Wirth Decl., Ex. L; and (iv) "need[ing] constant conversations to stay in the facility and to assist patient's with exercises," Wirth Decl., Ex. M.

Although the Plaintiff does not dispute that the above-five employees sent letters to Wirth complaining of his workplace conduct, again relying solely on his own testimony, he disputes that he actually engaged in such conduct. (See Joint 56.1 Statement at ¶¶ 47–49; see also Cherry-Wood Decl., Lee Dep., Ex. A, at Tr. 303:18–304:22; 305:20–306:7.)

## F. The Plaintiff's Discharge

On June 11, 2012, after reviewing the five employees' written complaints about the Plaintiff's conduct, Wirth interviewed the Plaintiff and Vitale. (Wirth Decl. at ¶ 32.) Accord to a declaration filed by Wirth, during the interview, the Plaintiff "made several inappropriate comments to Ms. Vitale and was disrespectful toward her." (Id.) Based on his interview with Lee and Vitale, Wirth determined that the employees' complaints about the Plaintiff were credible, and decided to recommend to Winthrop's Human Resources department that the Plaintiff's employment be terminated. (Id.)

To that end, on June 13, 2012, Wirth sent a form to Human Resources describing: (i) the written warning given to the Plaintiff on November 24, 2010 regarding improper conduct toward

patients and insubordination; (ii) the last chance agreement signed by the Plaintiff on December 3, 2010; and (iii) the June 1, 2012 incident. (Wirth Decl., Ex. O.) Based on these incidents, Wirth recommended the Plaintiff's "termination for loss of confidence." (Id.)

Subsequently, Winthrop terminated the Plaintiff's employment as of June 20, 2012.

On June 25, 2012, the Plaintiff filed an internal grievance form to challenge his termination. (Wirth Decl., Ex. P.) In it, he described his grievance as follows, "Rule violated insubordination. Date of occurrence 5/8/12. No conference was held with supervisor. Personal relationship & professional Boundaries [sic] got crossed." (Id.) Notably absent from the Plaintiff's grievance form was any complaint about race discrimination.

On July 13, 2012, Winthrop Human Resources held a grievance hearing regarding the Plaintiff's termination. Gary Schwall ("Schwall"), the chief operating officer of Winthrop, presided over the hearing and the attendees included, the Plaintiff, Caldon, Wirth, and Vitale. At the hearing, when asked by Schwall for "any information that would support your belief that you should not have been terminated," the Plaintiff responded:

> The day of the incident caught me off guard. I have been trying to work things out with Terry because we have been having issues recently. Me and Terry's daughter — I broke off the relationship with her daughter — Terry got upset.

(Wirth Decl., Ex. Q.) Here again, race is conspicuously absent from the Plaintiff's explanation.

Wirth and Vitale also testified about the Plaintiff's alleged prior misconduct and described him as a "bully," "disruptive," and someone who other employees "do not want to work with." (Id.)

On July 18, 2012, Caldon sent a letter to the Plaintiff notifying him that Schwall upheld the decision to terminate the Plaintiff.

In a declaration filed in support of the Defendants' motion for summary judgment, Caldon stated that after the Plaintiff was terminated, "his job duties and workload was assumed by existing employees, and no employee was hired to replace him."  (Caldon Decl. at ¶ 12.)

On October 7, 2013 and October 21, 2013, more than a year after the Plaintiff's termination, Winthrop hired Laura Fried ("Fried") and Lisa Campbell ("Campbell") as PT Aides in the PT Department.  (Id. at ¶¶ 13–14.)  Although they performed the same duties as the Plaintiff, Caldon states that they "were not hired to replace Jermaine Lee after his employment at Winthrop was terminated."  (Id. at ¶ 16.)

## G. Procedural History

On February 28, 2013, the Plaintiff filed a charge against Winthrop with the Equal Employment Opportunity Commission ("EEOC").  The parties do not attach a copy of the charge, and therefore, it is not clear what discrimination claims it contained.

On June 6, 2013, the EEOC issued a notice of dismissal notifying the Plaintiff of his right to commence suit in state or federal court within ninety days.

As noted, on September 6, 2013, the Plaintiff commenced this action against the Defendants.  The Plaintiff asserts a cause of action under Title VII and the NYSHRL against Winthrop based on the following allegation:  "because of [the] Plaintiff's race, national origin, and protected activities, [Winthrop] have [sic] maintained an atmosphere of adverse actions against [the] Plaintiff, and/or subjected [the] Plaintiff to a hostile work environment."  (Compl. at ¶ 53.)

In addition, the Plaintiff asserts claims under the NYSHRL and NYCHRL against the Individual Defendants for "aiding and abetting" in the alleged discriminatory conduct.  (Id. at 55–56.)

On February 14, 2014, the Defendants filed an answer to the complaint.

On March 20, 2014, discovery commenced.

Presently before the Court is the Defendants' motion pursuant to Fed. R. Civ. P. 56 for summary judgment dismissing the complaint in its entirety.

## II. DISCUSSION

### A. Legal Standards

Fed. R. Civ. P. 56(a) provides that a court may grant summary judgment when the "movant shows there is no genuine issue as to any material fact, and the moving party is entitled to judgment as a matter of law."

"Where the moving party demonstrates 'the absence of a genuine issue of material fact,' Celotex Corp. v. Catrett, 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986), the opposing party must come forward with specific evidence demonstrating the existence of a genuine dispute of material fact." Brown v. Eli Lilly & Co., 654 F.3d 347, 358 (2d Cir. 2011) (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)).

In that regard, a party "must do more than simply show that there is some metaphysical doubt as to the material facts[.]" Id. (quoting Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986)). Further, the opposing party "'may not rely on conclusory allegations or unsubstantiated speculation[.]'" F.D.I.C. v. Great Am. Ins. Co., 607 F.3d 288, 292 (2d Cir. 2010) (quoting Scotto v. Almenas, 143 F.3d 105, 114 (2d Cir. 1998)).

"Where it is clear that no rational finder of fact 'could find in favor of the nonmoving party because the evidence to support its case is so slight,' summary judgment should be

granted." Id. (quoting Gallo v. Prudential Residential Servs., Ltd. P'ship, 22 F.3d 1219, 1224 (2d Cir. 1994)).

**B. As to Race Discrimination**

The Plaintiff asserts claims against Winthrop for race discrimination under Title VII and NYSHRL arising from Winthrop's decision to terminate his employment as of June 20, 2012.

Claims of race discrimination under Title VII and the NYSHRL are analyzed under the burden-shifting framework established by McDonnell Douglas v. Green, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973).  See also Lore v. City of Syracuse, 670 F.3d 127, 169 (2d Cir. 2012) ("[D]iscrimination claims under the HRL are evaluated using the same analytical framework used in Title VII actions.").

Under the McDonnell Douglas framework, a "plaintiff has the initial burden of making out a *prima facie* case of discrimination," which may be accomplished by showing evidence that:  "(1) he belongs to a protected group; (2) he was qualified for his position; (3) his employer took an adverse action against him; and (4) the adverse action occurred in circumstances giving rise to an inference of race discrimination." Kirkland v. Cablevision Sys., 760 F.3d 223, 225 (2d Cir. 2014) (per curiam); see also Farias v. Instructional Sys., Inc., 259 F.3d 91, 98 (2d Cir. 2001) (same).  "The plaintiff's burden of proof as to this first step 'has been characterized as 'minimal' and 'de minimis.'" Zann Kwan v. Andalex Grp. LLC, 737 F.3d 834, 844 (2d Cir. 2013) (quoting Jute v. Hamilton Sundstrand Corp., 420 F.3d 166, 173 (2d Cir. 2005)).

Once "an employee makes a *prima facie* case of . . . discrimination . . . , the burden shifts to the employer to give a legitimate, non-discriminatory reason for its actions." Kirkland, 760 F.3d at 225.  If "the employer does so, the burden then shifts back to the plaintiff to show

that the employer's explanation is a pretext for race discrimination." Id. (citing McDonnell Douglas, 411 U.S. at 802, 93 S.Ct. 1817). Therefore, "once the defendant has made a showing of a neutral reason for the complained of action, 'to defeat summary judgment . . . the plaintiff's admissible evidence must show circumstances that would be sufficient to permit a rational finder of fact to infer that the defendant's employment decision was more likely than not based in whole or in part on discrimination.'" (quoting Stern v. Trustees of Columbia Univ. in City of New York, 131 F.3d 305, 312 (2d Cir. 1997)).

The Defendants assert that the Plaintiff has failed to make a *prima facie* case as to the fourth element — namely, whether the Plaintiff's termination occurred under circumstances giving rise to an inference of race discrimination. (The Defs.' Mem. of Law at 14–18.)

In response, the Plaintiff first asserts that he has made a *prima facie* case that his termination was the result of discrimination "through the 'mere fact' that Laura Friedn [sic], and Laura Campbell [sic], two white females replaced [The Plaintiff] as physical therapy aide [sic]." (The Pl.'s Mem. of Law at 9.) The Court disagrees.

The Plaintiff is correct that "the mere fact that a plaintiff was replaced by someone outside the protected class will suffice for the required inference of discrimination at the *prima facie* stage of the Title VII analysis." Zimmermann v. Associates First Capital Corp., 251 F.3d 376, 381 (2d Cir. 2001). However, as an initial matter, the plaintiff must produce some evidence that the employer sought to hire an individual to replace the plaintiff, as opposed to redistributing his or her duties among other employees.

For example, in Westbrook v. City Univ. of New York, 591 F. Supp. 2d 207, 227 (E.D.N.Y. 2008), the court rejected an argument by an African American employee that she had made a *prima facie* case of race discrimination based on a contention that her employer had

"'ultimately replaced plaintiff's position and functions'" with a Caucasian female. That is because the court found it was undisputed that after the plaintiff's termination, "her job responsibilities were delegated to a number of existing employees." Id. While the Caucasian employee had assumed "some of plaintiff's responsibilities," the court found that this fact alone "does not support plaintiff's contention or raise an issue of material fact as to whether defendants actually sought and hired a replacement for plaintiff's position." Id.; see also Brown v. Northrop Grumman Corp., No. 12-CV-1488 JS GRB, 2014 WL 4175795, at *8 (E.D.N.Y. Aug. 19, 2014) ("Thus, Plaintiff has not provided any competent evidence to support her claim that Northrop Grumman 'replaced' her with a male software engineer other than that she trained Rocchio in Oracle work, which is insufficient alone to give rise to an inference of discrimination."); Morris v. Northrop Grumman Corp., 37 F. Supp. 2d 556, 573 (E.D.N.Y. 1999) (Spatt, J) ("[A] discharged employee 'is not replaced when another employee is assigned to perform the plaintiff's duties in addition to other duties, or when the work is redistributed among other existing employees already performing related work. Rather, 'a person is replaced only when another employee is hired or reassigned to perform the plaintiff's duties.'") (quoting LeBlanc v. Great Am. Ins. Co., 6 F.3d 836 (1st Cir. 1993)).

Here, the only evidence in the record is contrary to the Plaintiff's contention that he was replaced by Campbell and Fried. In a declaration filed in support of the Defendants' motion, Caldon, the Manger of Employee Relations at Winthrop since 2004, stated that after the Plaintiff was fired on June 20, 2012, "his job duties and workload were assumed by existing employees and no employee was hired to replace him." (Caldon Decl. at ¶ 12.) Further, Fried and Campbell were not hired as PT Aides until October 7, 2013 and October 20, 2013, respectively. (Id. ¶¶ 13, 14) The fact that they were hired more than one year after the Plaintiff's termination

makes it appear highly unlikely that they were hired to be direct replacements for the Plaintiff. Thus, without more, the Court finds that the Plaintiff's contention that he was replaced by Campbell and Fried is unsupported in the record and insufficient to create a triable issue of fact.

The Plaintiff next contends that he has met his *prima facie* burden because of all "the physical therapy aides of [Winthrop's] physical therapy department[,] . . . plaintiff was the only one who was [sic] African American male and the only one ever terminated." (Id.) Here again, the Court finds the Plaintiff's contention to be without factual or legal support.

In support **of** his contention, the Plaintiff relied on the following testimony by Wirth:

> Q. After Jennaine's termination, were there any other employees who were terminated?
> A. Not to my knowledge

(Cherry-Wood Decl., Wirth Dep., Ex. A, 69:4–7.) This testimony says nothing about how many African American males were employed in the PT Department. Indeed, it is undisputed that during the period of the Plaintiff's employment, Aya Perkins, an African American female, was also employed by the PT Department, a fact which undermines the Plaintiff's contention that the racial make-up of the PT Department, which was comprised of only twelve employees, could lead one to conclude that his termination reflected race discrimination. (See Joint 56.1 Statement at ¶ 54.)

Perhaps more importantly, as the Defendants correctly point out, courts in this Circuit have repeatedly held that "a racial imbalance in the workplace is insufficient, by itself, to establish discrimination." Dent v. U.S. Tennis Ass'n, No. 08 CV 1533 (RJD) (VVP), 2011 WL 308417, at *8 (E.D.N.Y. Jan. 27, 2011) (collecting cases); see also Brown, 163 F.3d at 712 ("To establish a *prima facie* case of disparate impact, a plaintiff must show that a facially neutral employment policy or practice has a significant disparate impact . . . . Allegations which contend

only that there is a bottom line racial imbalance in the work force are insufficient."); <u>Farrar v. Town Of Stratford</u>, 537 F. Supp. 2d 332, 346 (D. Conn. 2008) ("The fact that Farrar was the only African American candidate selected for an interview does not support Farrar's position because no evidence has been submitted showing that the Town excluded African Americans from the interview process, or that any other African Americans even applied for the position."); <u>Anderson v. Hertz Corp.</u>, 507 F. Supp. 2d 320, 329 (S.D.N.Y. 2007) aff'd, 303 F. App'x 946 (2d Cir. 2008) ("The fact that Plaintiff was the only African American Station Manager at Defendant's Stewart Airport location in Holl's 12 years of supervising that particular site does not supply evidence sufficient for Plaintiff to establish a *prima facie* case of discrimination.").

Thus, even construing the Plaintiff's allegation that the PT Department hired few African Americans as true, that fact, by itself, would not be sufficient to establish a *prima facie* case of race discrimination.

The Plaintiff also attempts to establish a *prima facie* case of disparate treatment. "A showing of disparate treatment — that is, a showing that the employer treated plaintiff 'less favorably than a similarly situated employee outside his protected group'— is a recognized method of raising an inference of discrimination for purposes of making out a *prima facie* case." <u>Mandell v. Cnty. of Suffolk</u>, 316 F.3d 368, 379 (2d Cir. 2003) (citing <u>Graham v. Long Island R.R.</u>, 230 F.3d 34, 39 (2d Cir. 2000)).

However, it is well-established that mere conclusory assertions that the employees outside of the plaintiff's class were treated more favorably will not suffice to create a triable issue of fact. <u>See</u> <u>Watson v. Arts & Entm't Television Network</u>, No. 04 CIV. 1932 (HBP), 2008 WL 793596, at *16 (S.D.N.Y. Mar. 26, 2008) aff'd, 352 F. App'x 475 (2d Cir. 2009) ("Vague references that plaintiff's treatment was inferior to that afforded to unidentified comparators are

insufficient to withstand a motion for summary judgment."); <u>Chandler v. AMR Am. Eagle Airline</u>, 251 F. Supp. 2d 1173, 1184 (E.D.N.Y. 2003) ("Other than a vague allegation that another un-named employee once mentioned that she received a higher hourly wage, . . . , plaintiff has provided no evidence in support of his disparate pay claim. Thus, plaintiff has failed to establish a *prima facie* case of discriminatory compensation.").

Here, the Plaintiff offers no support for his contention that "similarly situated employees outside Plaintiff's protected classes were treated more favorably." (The Pl.'s Opp'n Mem. of Law at 9.) There is some implicit suggestion in the Plaintiff's legal memorandum that he was treated differently than Delligatti, who as noted above, is a Caucasian PT Aide who was promoted from a *per diem* position, without benefits, to a full-time position on April 1, 2010, which made her eligible for healthcare benefits. (<u>Id.</u> at 3; <u>see also</u> Caldon Decl. at ¶¶ 6–9.) The Plaintiff appears to allege that Delligatti was treated more favorably than him because (i) he had asked Wirth about interviewing for a full-time position in late 2009 but was told by Wirth to apply for a part-time position; and (ii) Delligatti received healthcare benefits, and he did not. (<u>See</u> the Pl.'s Opp'n Mem. of Law at 3.) The Court again finds the Plaintiff's assertions to be without support.

As to the first contention, in order to make a *prima facie* case for disparate treatment, the plaintiff must "show that the employer treated him or her 'less favorably than a similarly situated employee' outside of the protected group.'" <u>Raspardo v. Carlone</u>, 770 F.3d 97, 126 (2d Cir. 2014) (quoting <u>Graham v. Long Island R.R.</u>, 230 F.3d 34, 39 (2d Cir. 2000)). The Second Circuit has explained that "the standard for comparing conduct requires a reasonably close resemblance of the facts and circumstances of plaintiff's and comparator's cases, rather than a showing that both cases are identical . . . . The determination that two acts are of comparable

23

seriousness requires — in addition to an examination of the acts — an examination of the context and surrounding circumstances in which those acts are evaluated." Graham, 230 F.3d at 40. Thus, a plaintiff must adduce at least some evidence regarding another employee's qualifications and circumstances, in order to make out a *prima facie* case of disparate treatment.

Here, the Plaintiff has produced no evidence showing what Delligatti's qualifications were, let alone how they compared to the Plaintiff's qualifications. Thus, no rationale fact finder could infer disparate treatment on the basis of the Defendants' decision to hire Delgado for a full-time position instead of the Plaintiff. See Varughese v. Mount Sinai Med. Ctr., No. 12 CIV. 8812 (CM) (JCF), 2015 WL 1499618, at *41 (S.D.N.Y. Mar. 27, 2015) ("It is impossible to draw an inference of discrimination in a failure to promote claim where the available evidence provides no foundation for comparison between the plaintiff and the person promoted."); Sareen v. Port Auth. of New York & New Jersey, No. 12 CIV. 2823 (PAE), 2013 WL 6588435, at *9 (S.D.N.Y. Dec. 16, 2013) ("Sareen attempts to show discriminatory intent on the part of defendants in denying his 2009 applications for promotion by claiming disparate treatment, i.e., that he was screened out of the interview process or otherwise denied promotional opportunities in favor of candidates who were not minorities or were younger. But he offers no evidence to establish that he was treated less favorably than similarly situated employees outside his protected groups . . . . Thus, the evidence adduced by Sareen is insufficient to establish discriminatory intent in connection with that employment action.").

Furthermore, the Plaintiff's contention that he was denied health benefits but Delligatti was not is plainly contradicted by the evidence in the record. Delligatti received healthcare benefits because after being promoted to a full-time PT Aide position, she submitted an election form opting into the program. (See Caldon Decl., Ex. A.) On the other hand, the Plaintiff has

submitted no evidence suggesting that he properly opted-in to the program. Indeed, when asked at his deposition whether he had submitted an election form after he was promoted to a part-time PT Aide position on August 15, 2010, the Plaintiff responded, "I don't recall." (Zalman Decl., Ex. A, at Tr. 237:14–238:2.)

Delligatti did properly enroll in the program, and the Plaintiff apparently did not. Therefore she is not an appropriate comparator. Also, the fact that she received benefits does not demonstrate discriminatory treatment, as the Plaintiff contends, and instead suggests that the Plaintiff's failure to receive benefits was the result of his own decision not to file a proper election form. See Famoso v. Marshalls of MA, Inc., No. 12-CV-4863 (DLI) (VVP), 2015 WL 5793308, at *20 (E.D.N.Y. Sept. 30, 2015) ("While Plaintiff is not required to show that Mr. Imerukaj and Mr. Thom had performance records identical to his, Plaintiff falls far short of demonstrating that either individual had a record of sustained underperformance comparable to his."); Henderson v. Montefiore Med. Ctr., No. 12 CV 1468 (HB), 2013 WL 1155421, at *6 (S.D.N.Y. Mar. 21, 2013) ("Because Levie therefore is not an appropriate comparator, his appointment does not demonstrate discriminatory animus.").

Finally, the Plaintiff suggests that several comments allegedly made by Vitale and Wirth give rise to an inference that the Plaintiff's termination was the result of discrimination. Again, the Court disagrees.

"Stray remarks of a decision-maker, without more, cannot prove a claim of employment discrimination[.]" Abdu-Brisson v. Delta Air Lines, Inc., 239 F.3d 456, 468 (2d Cir. 2001). However, "when 'other indicia of discrimination are properly presented, the remarks can no longer be deemed 'stray,' and the jury has a right to conclude that they bear a more ominous significance.'" Id. (quoting Danzer v. Norden Systems, Inc., 151 F.3d 50, 56 (2d Cir. 1998)).

The Second Circuit has adopted the following framework in determining whether a remark is probative of discrimination, as opposed to a stray remark that is not:

> (1) who made the remark (i.e., a decision-maker, a supervisor, or a low-level co-worker); (2) when the remark was made in relation to the employment decision at issue; (3) the content of the remark (i.e., whether a reasonable juror could view the remark as discriminatory); and (4) the context in which the remark was made (i.e., whether it was related to the decision-making process).

Henry v. Wyeth Pharm., Inc., 616 F.3d 134, 149-50 (2d Cir. 2010).

For example, in Abdu-Brisson v. Delta Air Lines, Inc., 239 F.3d 456, 468 (2d Cir. 2001), the Second Circuit determined that an airline-employer's "comments about the age of the Pan Am pilot force, referring to them as 'contaminated' and 'Bad Apples'" could, when "viewed against the background of Delta's all-consuming interest in the age and projected retirement rates of the Pan Am pilots," give rise to an inference that "Delta's actions may indeed have been motivated by age-based animus."  See also O'Diah v. Yogo Oasis, 954 F. Supp. 2d 261, 272 (S.D.N.Y. 2013) (denying summary judgment based on, among other things, "evidence that Shin made numerous discriminatory remarks concerning O'Diah's race and national origin throughout his employment at Roastown. These comments — in particular, Shin's statement to O'Diah at the time he was fired, that 'You Nigerians can't be trusted' — clearly support the inference that Shin's decision to terminate O'Diah was motivated by discriminatory animus.").

However, where a supervisor's remarks are unrelated to an employment decision, and there is no other evidence of discrimination, courts have not hesitated to find that an employee has failed to meet his or her *prima facie* burden.  See, e.g., Sethi v. Narod, 12 F. Supp. 3d 505, 543 (E.D.N.Y. 2014) ("However, the discriminatory remarks were made 15 months after Plaintiff's employment terms were established and three months prior to Plaintiff's suspension, in a context unrelated to these employment decisions, which supports a finding that the remarks

are not probative of discriminatory animus . . . . The Court finds that although Narod is a decisionmaker, his comments were stray remarks as they were unrelated to Plaintiff's suspension, and therefore they do not constitute sufficient evidence to establish an inference of discrimination."); Del Franco v. New York City Off-Track Betting Corp., 429 F. Supp. 2d 529, 537 (E.D.N.Y. 2006) ("Even when viewed in the light most favorable to plaintiff, these comments are isolated remarks and are therefore insufficient to establish that plaintiff's discharge occurred under circumstances giving rise to an inference of age discrimination.").

In the present case, the Plaintiff testified that Vitale, his direct supervisor, referred him as a "black son" and a "womanizer." (Zalman Decl., Ex. A at Tr. 110:18–11–113:3.) He also testified that Wirth, who oversaw the PT Department, called him a "faggot," a "schmoozer," and a "black son." (Id. at Tr. 49:3–23.)

Most of these alleged comments appear race-neutral. While the comments such as, "faggot," "schmoozer," and "womanizer," are offensive, they do not, by themselves, support an inference of race discrimination. See Henry, 616 F.3d at 150 ("'The relevance of discrimination-related remarks does not depend on their offensiveness, but rather on their tendency to show that the decision-maker was motivated by assumptions or attitudes relating to the protected class.'") (parenthetically quoting Tomassi v. Insignia Financial Grp., Inc., 478 F.3d 111, 115 (2d Cir. 2007), abrogated on other grounds, Gross v. FBL Financial Servs., Inc., 557 U.S. 167 (2009)).

Further, although the term, "black son," could be viewed as discriminatory, the Plaintiff provides no details on when the Vitale and Wirth made the comments, how frequently, and in what context they were made. When asked when Wirth referred to him as a black son, the Plaintiff answered, "While I was employed at Winthrop" — a period that covers four years.

(Zalman Decl., Ex. A, at Tr. 52:6–7.)  Similarly, the Plaintiff offered similarly vague responses when asked to describe the context of Vitale's alleged reference to him as "black son":

> Q. Is black son a racial slur?
> A. Yes.
> Q. Yes. Okay. How many times did Terry use the term 'black son'?
> A. I don't recall.
> Q. Was it more than once?
> A. Yes.
> Q. Who was present when she used that term?
> A. I don't recall but people were present.
> Q. Where were you when she used this term?
> A. I was at work. I don't recall . . . .
> Q. Can you tell me any specific occasion when Terry used the term black son?
> A. I don't recall.

(Id. at Tr. 110:15–112:9.)

Based on such vague and unsupported testimony, the Court finds that no reasonable juror could conclude that the Vitale and Wirth's alleged comments had anything to do with the Defendants' decision to terminate the Plaintiff's employment.  See Adam v. Glen Cove Sch., No. 06-CV-1200 (JFB) (MLO), 2008 WL 508689, at *8 (E.D.N.Y. Feb. 21, 2008) ("In the instant case, the alleged isolated remarks by Jimmy and Familetti when considered in the context of all the evidence, are too 'remote and oblique . . . . in relation to the employer's adverse action' to permit a reasonable jury to find for plaintiff.") (quoting Tomassi v. Insignia Fin. Group., 478 F.3d 111, 115 (2d Cir. 2007)); see also Sethi, 12 F. Supp. 3d at 544 ("The Court finds that although Narod is a decisionmaker, his comments were stray remarks as they were unrelated to Plaintiff's suspension, and therefore they do not constitute sufficient evidence to establish an inference of discrimination.").

The Court notes that even if the Plaintiff had satisfied his *prima facie* burden, the Defendants have offered a legitimate reason for terminating him.  Prior to his termination, the Plaintiff had a well-documented disciplinary history.  On November 23, 2010, a written warning

was placed in his disciplinary file because of three incidents during which the Plaintiff made threatening gestures toward Vitale and comments, such as, "You will get yours." (Zalman Decl., Ex. G.) Further, on November 24, 2010, the Plaintiff was again written up for calling a patient a "playboy" and referring to the patient's cane as a "pimping stick." (Id.)

On December 3, 2010, in response to these incidents, Winthrop required the Plaintiff to sign a last chance agreement that made it clear that any further disruptive actions would result in his termination. (See Zalman Decl., Ex. H.)

Finally, on June 1, 2012, four separate employees witnessed the Plaintiff refuse to take a lunch break despite Vitale's clear instructions to do so, and subsequently, swing a bolster in Vitale's direction. (See Zalman Decl., Exs. J–M.) The employees also referenced other incidents in which the Plaintiff allegedly acted inappropriately toward patients by constantly hugging them and calling them pet names. (See id.)

Therefore, the Plaintiff's disciplinary history provides an ample non-discriminatory basis for Winthrop's decision to terminate his employment. See Matima v. Celli, 228 F.3d 68, 79 (2d Cir. 2000) ("We have held generally that insubordination and conduct that disrupts the workplace are 'legitimate reasons for firing an employee.'") (quoting Holt v. KMI–Continental, Inc., 95 F.3d 123, 130 (2d Cir. 1996)); see also Schnabel v. Abramson, 232 F.3d 83, 87-88 (2d Cir. 2000) ("Defendants, in turn, have satisfied their burden under McDonnell Douglas of articulating legitimate, nondiscriminatory business reasons why Schnabel was discharged. These reasons, . . . include: plaintiff's asserted contempt for Legal Aid clients, difficulty following instruction, 'outright insubordination,' and 'inept[ ]' performance.").

Thus, the Defendants have clearly offered evidence indicating that it had a legitimate non-discriminatory reason for terminating the Plaintiff, which shifts the burden back to the

Plaintiff to offer admissible evidence of "circumstances that would be sufficient to permit a rational finder of fact to infer that the defendant's employment decision was more likely than not based in whole or in part on discrimination." Terry v. Ashcroft, 336 F.3d 128, 138 (2d Cir. 2003) (quoting Stern v. Trustees of Columbia Univ. in City of New York, 131 F.3d 305, 312 (2d Cir. 1997)).

There is no such evidence in the record. The Plaintiff attempts to create a genuine issue of material fact by asserting that the disciplinary warnings he received were without basis, and by denying that he engaged in any sort of misconduct. (See The Pl.'s Mem. of Law at 10–11.)

However, courts in this Circuit have repeatedly found that "'[t]he mere fact that an employee disagrees with her employer's assessments of her work . . . cannot standing on its own show that her employer's asserted reason for termination was pretextual.'" Glen Cove Sch., 2008 WL 508689 at *9 (quoting Ricks v. Conde Nast Publs., 92 F.Supp.2d 338, 347 (S.D.N.Y. 2000)); see also Holleman v. Art Crating Inc., No. 12 CIV. 2719 VMS, 2014 WL 4907732, at *41 (E.D.N.Y. Sept. 30, 2014) ("[A] plaintiff's subjective disagreement with the employer's assessment of her performance is not actionable under the discrimination statutes."); White v. Pacifica Found., 973 F. Supp. 2d 363, 382 (S.D.N.Y. 2013) ("'[F]aulting others for, or otherwise rationalizing, problems legitimately perceived by [an] employer does not establish pretext.'") (quoting Taylor v. Polygram Records, No. 94 Civ. 7689 (CSH), 1999 WL 124456, at *10 (S.D.N.Y. 1999)).

Rather, in order to show that discrimination was a "determinative factor" in an employee's termination, he or she must show "'either . . . a discriminatory motive, more likely than not, motivated the defendants or by proving both that the reasons given by the defendants are not true and that discrimination is the real reason for the actions.'" Summa v. Hofstra Univ.,

708 F.3d 115, 129 (2d Cir. 2013) (emphasis added) (quoting <u>Gordon v. New York City Bd. of Educ.</u>, 232 F.3d 111, 117 (2d Cir. 2000)).

Here, as discussed earlier, the record is entirely bereft of any evidence probative of discrimination. Instead, what the Plaintiff has offered are a few vague references to alleged discriminatory comments made by his supervisors at unspecified times over a period of four years and unsupported allegations of disparate treatment. This falls far short of the evidence required to create a genuine issue of material fact as to whether the Defendants' well-supported rationale for firing him — namely, his documented history of insubordination and disruptive conduct — was pre-textual and instead, motivated by discrimination. <u>See</u> <u>Glen Cove Sch.</u>, 2008 WL 508689 at *10 ("Thus, summary judgment is appropriate here because the defendant has offered a legitimate, non-discriminatory reason for plaintiff's discharge-namely, the charges of insubordination-and plaintiff's vague and conclusory allegations of discrimination are not sufficient to allow a finder of fact to conclude that the explanation was merely a pretext for discrimination.").

Therefore, the Court grants the Defendants' motion for summary judgment as to the Plaintiff's first cause of action against Winthrop for race discrimination under Title VII and the NYSHRL.

**C. As to Other Potential Theories of Discrimination**

Although not entirely clear, the Plaintiff references two other theories of discrimination — (i) national origin and (ii) hostile work environment — in the complaint:

> [B]ecause of [the] [P]laintiff's race, national origin, and protected activities, [the Defendants] have taken adverse employment actions against [the Plaintiff], have maintained an atmosphere of adverse action against [the] [P]laintiff, and/or have subjected [the] [P]laintiff to a hostile work environment, in violation of Title VII . . . [and] [the] [NYSHRL].

(Compl. at ¶ 53.)

The reference to the Plaintiff's national origin is entirely conclusory. There is no evidence in the record as to what the Plaintiff's national origin is, let alone suggesting any discriminatory conduct on the basis of his purported national origin. However, even if the Plaintiff had asserted a national origin claim, the Court finds that it would fail as a matter of law. See Whyte v. Nassau Health Care Corp., 969 F. Supp. 2d 248, 258 (E.D.N.Y. 2013) (granting summary judgment because "plaintiff has offered no evidence demonstrating that any of defendant's actions were based on race or national origin other than her conclusory assertion that she was 'the only African American Medical Technologist of Jamaican origin'").

The reference to a "hostile work environment" claim also fails to raise a triable issue of fact. "A hostile work environment claim under both the Title VII and NSYHRL requires a showing [1] that the harassment was 'sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment,' and [2] that a specific basis exists for imputing the objectionable conduct to the employer.'" Alfano v. Costello, 294 F.3d 365, 373 (2d Cir. 2002) (quoting Perry v. Ethan Allen, Inc., 115 F.3d 143, 149 (2d Cir. 1997)); see also Forrest v. Jewish Guild for the Blind, 3 N.Y.3d 295, 786 N.Y.S.2d 382, 819 N.E.2d 998 (N.Y. 2004) (applying a similar standard to NYHRL hostile work environment claims).

"Isolated incidents generally will not suffice to establish a hostile work environment unless they are extraordinarily severe." Costello, 294 F.3d at 373; see also Fincher v. Depository Trust & Clearing Corp., 604 F.3d 712, 724 (2d Cir. 2010) ("The plaintiff must show more than a few isolated incidents of racial enmity, . . . although a hostile work environment can also be

established through evidence of a single incident of harassment that is extraordinarily severe[.]")
(citations and alterations omitted).

As discussed earlier, the Plaintiff's primary basis for his discrimination claims is his
testimony that Vitale and Wirth made comments, such as "black son," "faggot," and
"womanizer," at unspecified times, as well as his unsupported assertions of disparate treatment.
Although some of the comments are objectionable, they are insufficient to establish a hostile
work environment claim, particularly in light of the lack of any other evidence of discrimination.
See Gerardi v. Huntington Union Free Sch. Dist., No. 13-CV-4377 (ADS) (AKT), 2015 WL
5062451, at *18 (E.D.N.Y. Aug. 25, 2015) (Spatt, J) ("Even assuming, that the seemingly
disparate events that the Plaintiff now points to in her memorandum were related to her
resignation, they fall far short of what an objectively reasonable person would consider
discriminatory or pervasive enough to force her to resign."); Glen Cove Sch., 2008 WL 508689,
at *11 ("However, viewing the evidence in the light most favorable to plaintiff, the Court finds
that these examples are at best 'episodic,' and are not 'sufficiently continuous and concerted in
order to be deemed pervasive' and, therefore, any hostile work environment claim brought by
plaintiff would fail to survive summary judgment.").

Thus, to the extent that the Plaintiff is asserting a national origin or hostile work
environment claim, the Court finds those claims fail as a matter of law.

**D. As to the NYSHRL and NYCHRL Claims**

Finally, the Plaintiff asserts claims against the Individual Defendants under (1) the
NYSHRL for "aiding and abetting" race discrimination under Section 296(6) of the NYSHRL;
and (2) the NYCHRL.

Section 296(6) of the NYSHRL states that it is an unlawful discriminatory practice "for any person to aid, abet, incite, compel or coerce the doing of any of the acts forbidden under [the NYSHRL], or attempt to do so." N.Y. Exec. Law § 296(6).

"[T]he predicate for imposing liability based on an aiding and abetting theory under the NYSHRL is the employer/principal's liability for discrimination under the statute." Daniels v. Wesley Gardens Corp., No. 10-CV-6336T, 2011 WL 1598962, at *3 (W.D.N.Y. Apr. 27, 2011). Thus, "[i]mportantly, since it is the employer's participation in the discriminatory practice which serves as the predicate for the imposition of liability on others for aiding and abetting, a plaintiff cannot prevail against an individual on her state claims unless she can first establish the liability of her employer." Doherty v. Fishers Island Ferry Dist., No. CV 14-3739 (LDW)(SIL), 2015 WL 1286103, at *3 (E.D.N.Y. Mar. 20, 2015) (quoting Pellegrini v. Sovereign Hotels, Inc., 740 F. Supp. 2d 344, 356 (N.D.N.Y. 2010)).

As the Court holds that the Plaintiff has failed to state a viable race discrimination claim against Winthrop based on the actions of its employees, it necessarily follows that the Plaintiff's claims against those same employees under an "aiding and abetting theory" also must fail. See Ying v. City Univ. of New York, No. 10-CV-4990 (CBA) (SMG), 2011 WL 6337666, at *2 (E.D.N.Y. Dec. 19, 2011) ("[B]ecause the plaintiff does not state a viable claim for sex discrimination, her claim for aiding and abetting sex discrimination fails as well."); Petrisch v. HSBC Bank USA, Inc., No. 07-CV-3303 (KAM) (JMA), 2013 WL 1316712, at *21 (E.D.N.Y. Mar. 28, 2013) ("Because plaintiff's underlying discrimination, retaliation, and hostile work environment claims under NYSHRL have been dismissed or otherwise abandoned, plaintiff's claims against Kourkoutis and Katz as aiders and abettors of such alleged discriminatory conduct fail as a matter of law.").

With respect to the Plaintiff's NYCHRL claim, it is well-established that in order "to state a claim under the NYCHRL, the Plaintiff must allege that the Defendant discriminated against her 'within the boundaries of New York City.'" Robles v. Cox & Co., 841 F. Supp. 2d 615, 623 (E.D.N.Y. 2012) (Spatt, J) (quoting Shah v. Wilco Sys., Inc., 27 A.D.3d 169, 175, 806 N.Y.S.2d 553, 558 (1st Dep't 2005)); see also Fried v. LVI Servs., Inc., No. 10 CIV. 9308 (JSR), 2011 WL 4633985, at *12 (S.D.N.Y. Oct. 4, 2011) aff'd, 500 F. App'x 39 (2d Cir. 2012) ("The NYCHRL expressly limits the applicability of its protections to acts that occur within the boundaries of New York City.") (citing N.Y.C. Admin. Code § 2–201).

There is no viable discrimination claim left in this case, let alone one that occurred within the boundaries of New York City. The Plaintiff is a Nassau County resident, who worked at the PT Department in Nassau County. None of the alleged conduct took place in New York City. Therefore, the NYCHRL is inapplicable to this case, and the Court also grants the Defendants' motion to dismiss that claim.

## III. CONCLUSION

For the foregoing reasons, the Defendants' motion for summary judgment is granted, and the Plaintiff's complaint is dismissed in its entirety. The Clerk of the Court is directed to close this case.

**SO ORDERED.**
Dated: Central Islip, New York
November 13, 2015

　_/s/ Arthur D. Spatt___
　ARTHUR D. SPATT
　United States District Judge